UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

TECHNICAL INDUSTRIES, INC.           CIVIL ACTION NO.09-cv-014

VERSUS                               MAGISTRATE JUDGE HANNA

STEEL SERVICE OIL FIELD
TUBULAR, INC.                        BY CONSENT OF THE PARTIES

MEMORANDUM RULING

This case presents a contractual dispute between Technical Industries, Inc.
(Technical) and Steel Service Oilfield Tubular, Inc. (SSOT) arising out of a pipe
procurement endeavor for Shell Oil Company. Jurisdiction is based on 28 U.S.C.
§1332 and the consent of the parties pursuant to 28 U.S.C. 636 (c)(1).[1]  Before the
Court is a Motion for Summary Judgment filed on behalf of defendant/counter
claimant, SSOT, [Doc. 35] in which SSOT seeks to have Technical's claims
dismissed and judgment rendered in favor of SSOT on its counterclaim.  The motion
is opposed on multiple grounds by Technical [Doc. 39].  A Reply Memorandum with
evidence was filed by SSOT. [Doc. 60]. Argument was held on August 24, 2011, and
for the reasons set forth herein, the motion is DENIED.

***Background***

---

[1]*Roell v. Withrow*, 538 U.S. 580, 585, 123 S.Ct. 1696, 1700-1701 (2003); *White v. Thaler*, 610 F.3d 890, 895-898 (5th Cir. 2010) and cases cited therein.

In June, 2008, Shell was in need of a quantity of N-80 pipe for use as completion pipe in its Rocky Mountain production program.  When acceptable pipe could not be procured from Shell's usual approved vendors due to what was described as an "unprecedented" shortage of steel in the market, Shell authorized the search for pipe from non-approved vendors.  Shell's exclusive pipe procurement company, Chickasaw Distributors, Inc. (Chickasaw) contacted SSOT, who did not supply N-80 pipe, but based on prior communications, was aware that Technical may be able to do so.  SSOT contacted Technical who advised that it could supply 100,000 feet of N-80, 2 3/8" seamless pipe manufactured by Niko Tubing('the Niko pipe').  SSOT advised Chickasaw that the pipe could be acquired and thus a transaction was contemplated in which Technical was to supply the Niko pipe to SSOT, who was to supply the pipe to Chickasaw, for end use by Shell.[2]

On June 23, 2008, Chickasaw issued a Purchase Order to SSOT for the purchase of the Niko pipe.[3]  The document indicated the quantity and type of pipe sought, that the order was "conditional" upon "SQS review" of inspection reports

---

[2]The following factual accounting is taken almost exclusively from e-mail correspondence and other documents submitted by the parties and is assumed as true for the purposes of this motion.

[3]Doc. 35-5, p. 44.

-2-

and that the review "should take until 6-27-08."[4]  Below this date "possible secondary inspections" were identified with no estimated completion time. Finally, the PO provided under the words "Order Specifications," "API 5CT - Latest Edition 7."[5]

On June 24, 2008, SSOT emailed a draft Purchase Order to Ron Piper at Technical to see if the exact same conditions referenced by Chickasaw were acceptable to Technical.[6]   However, neither Chickasaw nor Shell are referenced in the PO beyond the word "customer." Piper replied that the terms were acceptable and SSOT issued Purchase Order#5176 to Technical, which again designated the order specifications as "API-5CT - Latest Addition [sic] 7th".[7]   The PO also included the following additional language:

> TECHNICAL INDUSTRIES WILL TAKE BACK ANY MATERIALS
> WHICH DO NOT PASS INDEPENDENT 3RD PARTY INSPECTION
> TO SHELLS SPECIFICATIONS.

That same day Technical submitted the first of three versions of Invoice No.

---

[4]SQS is identified as Shell Quality Services.  It is apparent that the inspection reports contemplated by this entry had already been created and were in the possession of Technical.

[5]This API publication provides, among other things,  testing/inspection criteria for tubular goods.

[6]Doc. 35-10, p. 79.

[7]Doc. 35-6, p. 48.

08-0191 to SSOT seeking payment for the Niko pipe.[8]  The first version  did not contain any language concerning the return of rejected pipe.  Efforts were made by SSOT to have Technical revise the invoice to reflect that agreement, but there was difficulty reaching Technical's CEO, George Sfeir, who was out of the country and who was the only individual with authority to revise the invoice.[9]  By July 2, 2008, Sfeir had  instructed that the invoice be revised, and the first revised version of the invoice was submitted by Technical, bearing the same invoice  number and the original June 24, 2008 date.  The revised document included the following language:

> SUBJECT TO GOOD FOOTAGE POLICY. ALL **API REJECTED** PIPE WILL BE RETURNED TO TECHNICAL INDUSTRIES, INC. (Emphasis added) [10]

According to Sfeir, the language on the first revised invoice was Technical's standard for such invoices.[11]   Since the invoice did not contain language that Technical would take back pipe that did not meet ***Shell's*** inspection criteria, SSOT requested a second revision to the invoice which was authorized by Sfeir and

---

[8]Doc. 35-10, p. 1-3.

[9]Doc. 35-3, pp. 10-11.

[10]Doc. 35-10, p. 2.

[11]Doc. 35-6, p. 10.

generated by Technical.[12]   The final, corrected Invoice No. 08-0191('the Final

Corrected Invoice') included the following language:

> SUBJECT TO GOOD FOOTAGE POLICY.  ALL PIPE THAT DOES NOT
> MEET SHELL OIL COMPANY INSPECTION CRITERIA WILL BE
> RETURNED TO TECHNICAL INDUSTRIES, INC.[13]

The invoice clearly identified the type and amount of the pipe, (100,000 feet

of 2 3/8" N-80 SMLS, 4.7#, EUE, II.) the price of the pipe, (8.225/foot) and the

payment terms which included a $500,000 down  payment with the balance to paid

in 15 days.  On receipt of the Final Corrected Invoice, SSOT made an initial payment

of $500,000.00 to Technical.[14]   Even though the terms on the invoice had not been

finalized (as that did not occur until at least July 2), at Chickasaw's request, from

June 25th through June 30, all of the Niko pipe had been consigned by Technical to

SSOT, picked up and transported to a third party inspection facility known as

Tuboscope.[15] On June 25, Chickasaw directed Tuboscope to do the following by July

11:

> PLEASE PERFORM A 10% 12" TRANSVERSE & LONGITUDINAL
> WSEA, A 10% TG AUDIT AND A 100% VTI + VERIFY THE

---

[12]Doc. 35-6, p. 7-8.

[13]Doc. 35-10, p. 3.

[14]Doc. 35-6, p. 19, 35-11 p. 6.

[15]Doc. 35-14, pp. 4-14, Doc. 35-15, pp. 30-32.

MARKINGS TO MEET SHELL GREEN BOOK AND OCTG
REQUIREMENT LIST SPECIFICATIONS.
PLEASE MARK UP ONLY TUBING WHICH DOES NOT MEET API
5CT, LATEST EDITION REQUIREMENTS. [16]

An initial inspection report on the 10% sampling of the pipe was issued by
Tuboscope on July 23, 2008.[17]  The report indicates Shell's specifications were used
and the defects found in the thread gauge audit (TG) reflected an 18% rejection rate,
or 58 out of 321 joints, however, these were all designated as "repairable rejects" and
**not** Shell rejects.[18]  Rather than return or repair these 58 joints, Chickasaw advised
SSOT that it was proceeding with 100% TG inspections.[19]

On July 31, Technical asked SSOT to provide it a status update and expressed
a  desire to "finalize" the order.[20] SSOT responded that there was an 18% rejection
rate in the TG inspection, that they were proceeding with TG inspection of all the
pipe and that "Shell has indicated they would want the thread rejects after repair."[21]
Despite having no problem with the expanded testing, Mr. Sfeir testified that

---

[16]Doc. 35-13, p. 10.

[17]Doc. 35-10, p. 4.

[18]Id.

[19]Doc. 35-11 p. 21.

[20]Doc. 35-6, p. 51.

[21]Id.

Technical was requesting return of the rejected pipe and was doing so "all the time" although there is no correspondence to that effect at that point in time.[22]

On September 22, Tuboscope reported, utilizing "Shell GB" (presumably Shell's Green Book) specifications, 388 of 2868 joints had "repairable" defects with no "rejects" whether by the customer or otherwise.[23]   Technical was notified by SSOT that "Shell will purchase these joints [with the defects] after repair and pending the still unfinished mechanical testing," so Technical began making arrangements for the repairs.[24]   There was no indication by SSOT or Chickasaw of an intent to return the pipe with the defects determined in the 100% TG audit.  Quite the contrary, in the interim between the two test reports, on August 21, 2008, SSOT sent another payment to Technical in the amount of $174,450.[25]   Therefore, as of September 22, 2008, after all of the inspections done by Tuboscope, there was no indication in any correspondence that the end user did not intend to utilize the pipe purchased by SSOT from Technical.

In addition to the inspections conducted by Tuboscope, destructive

---

[22]Doc. 35-6, pp. 29-30.

[23]Doc. 35-10, p.8.

[24]Doc. 35-11, pp.

[25]Doc. 35-11, pp. 31-32.

metallurgical testing was also done by Anderson & Associates.  During the testing process, Anderson discovered that some of the samplings done by another company who could not complete the job were smaller than required by Shell specifications, therefore, Anderson had to consider only the results from the properly-sized samplings.  On September 26,  Anderson allegedly reported that many of these samplings did not meet Shell's specifications.[26]  Because the samplings were limited, efforts were allegedly undertaken to determine traceability of the pipe that were allegedly unsuccessful, and according to the ***testimony*** of Shell's representative, this created traceability problems in the entire order which would have allowed Shell to reject the entire order.[27]  However, that did not occur.

On September 30, contrary to the representations made by SSOT to Tehnical just eight days earlier, Chickasaw advised SSOT that Shell would not accept the "API rejects" after they had been repaired.[28]  Further, the quantity of pipe that would be accepted might be reduced further by poor destructive testing results.[29]  SSOT's representative, John Champagne testified he conveyed this information to Technical

---

[26]Doc. 35-10, pp. 78-108.

[27]Doc. 35-4, pp. 69-71.

[28]Doc. 35-11, p. 47.

[29]Id.

-8-

by telephone on September 30, however, there is no correspondence to that effect.[30]

On October 14, Chickasaw conveyed to SSOT that *Chickasaw* was "leaning towards returning this order because it is very difficult to determine what we have exactly that meets our customer's [Shell] requirements."[31]  That same day, Chickasaw suggested to SSOT another option for SSOT (or Technical) to consider, which was forwarded by SSOT to Technical to "discuss."[32]  Technical replied to SSOT:

> Our deal was to inspect 10,000' and decided [sic]. Then not to buy the rest or buy the rest of the pipe with no further inspections . . .We have allowed you 15 days for the inspection and the decision to be made or pay for the pipe. . . This Sharpie's test does not comply with API or any specs . . .  PLEASE RETURN THE REJECTED PIPE AS SOON AS POSSIBLE.[33]

Shortly after transmission of this correspondence, SSOT instructed Chickasaw to "ship the entire order back to Technical Industries."[34]   The following day, October 15, Technical asked SSOT for the return of  the pipe " your client do not need"[sic] by October 17 because there was a potential sale for the pipe at a higher price.[35]  In a

---

[30]Doc. 35-3, p. 20.

[31]Doc. 35 -11, p. 52.

[32]Doc. 35-11, pp 54-55.

[33]Doc. 35-11, p. 54.

[34]Doc. 35-11, p. 57.

[35]Doc. 35-11, p. 59.

series of e-mail correspondence, SSOT inquired of Chickasaw whether Chickasaw would be able to have the pipe returned to Technical within the week.[36]  Chickasaw advised that it would "subsequent to Shell releasing the tubing."[37]  Later that same morning, Chickasaw reported to SSOT and Technical that Shell needed to see the results on another "100kFT" before it would release the pipe, and if the results were negative the Niko would be "back in play."[38]

On October 17, SSOT provided Technical with Chickasaw's Task Sheet, indicating that the pipe (98,671.9 feet) was being returned.[39]  By October 28, all of the Niko pipe  had been returned to Technical, except for 1,558 feet, which had been destroyed during testing.[40]

Technical filed the instant  suit, seeking recovery of $148,050.00 from SSOT for the additional amount allegedly owed by SSOT on the Final Invoice, based on Technical's position that the pipe was fit for its intended use.  Technical asserts that SSOT failed to make a timely return of the pipe when called upon  to do so, and that

---

[36]Doc. 35-11, pp. 64-66.

[37]Doc. 35-11, p. 64.

[38]Doc. 35-11, p. 66.

[39]Doc. 35-6, p. 61.

[40]Doc. 35-13, pp. 1-6.

failure constituted a conversion under applicable Louisiana law, entitling Technical to damages.  Technical also asserts that all or some of the pipe returned by SSOT was damaged, and it was returned at a time when the market for such pipe had become depressed resulting in a devaluation of the pipe.

SSOT responded that the purchase of the pipe at issue was subject to a suspensive condition that the pipe  pass third party inspection using Shell's criteria. SSOT further argues that the pipe failed to pass the inspections and failed to meet Shell's criteria, and therefore, no sale occurred and/or the sale is otherwise void or unenforceable.   In its counterclaim, SSOT seeks to recover the $661,630.84(plus interest) it advanced Technical on the pipe order, which pipe was returned per the conditions set out in the Final Corrected Invoice and per Technical's request. Technical continues to hold the $661,630.84 advanced by Steel Service in 2008.

SSOT filed this motion asserting that there are no genuine issues of material fact on the issue of whether Technical agreed, but failed, to provide oil field pipe that met the inspection criteria and specifications of Shell, and the pipe was returned to Technical at Technical's request.  Thus, the suspensive condition was never fulfilled, no sale of the oil field pipe occurred, and SSOT is entitled to recover the money it advanced on the order, with interest.

Technical responds that there was a valid sale of the pipe at issue, admitting that

-11-

the sale was subject to the ***resolutory*** condition that pipe which failed to meet certain inspection criteria would be returned.  Technical asserts, however, that there are genuine issues of fact as to the terms of the resolutory condition, including: (1)which inspection criteria was agreed to, (2)what length of time was allowed for the inspection of pipe, (3)exactly how much pipe passed the inspections, and how much was repairable, and (4) whether Steel Service took ownership of the pipe when it failed to timely return the pipe to Technical.

### *Applicable Law and Discussion*

*Summary Judgment Standard*

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. A fact is material if proof of its existence or nonexistence might affect the outcome of the lawsuit under the applicable substantive law in the case. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986); *Minter v. Great American Ins. Co. of New York*, 423 F.3d 460, 465 (5th Cir. 2005). A genuine issue of material fact exists if a reasonable jury could render a verdict for the nonmoving party. *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008), citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. at 252.

The party seeking summary judgment has the initial responsibility of informing

the court of the basis for its motion, and identifying those parts of the record that it believes demonstrate the absence of a genuine issue of material fact. *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007), citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party carries its initial burden, the burden shifts to the nonmoving party to demonstrate the existence of a genuine issue of a material fact. *Id.* All facts and justifiable inferences are construed in the light most favorable to the nonmovant.  *Brumfield v. Hollins*, 551 F.3d at 326, citing *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 255.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by pointing out that there is insufficient proof concerning an essential element of the nonmoving party's claim. *Norwegian Bulk Transport A/S v. International Marine Terminals Partnership*, 520 F.3d 409, 412 (5th Cir. 2008), citing *Celotex Corp. v. Catrett*, 477 U.S. at 325. The motion should be granted if the non-moving party cannot produce evidence to support an essential element of its claim. *Condrey v. SunTrust Bank of Georgia*, 431 F.3d 191, 197(5th Cir. 2005).

*Substantive Law and Analysis*

As this case falls under the court's diversity jurisdiction, the parties do not

dispute that this Court is *Erie*-bound to apply Louisiana substantive law.  Since the claims arise out of a sale, the analysis  must begin with the pertinent provisions of the Louisiana Civil Code dealing with sales which  contain special provisions that take priority over the rules pertaining to obligations or contracts in general. La.Civ.Code  art. 2438.

*A. A perfected  sale or a contract to sell*

A sale under Louisiana law is a contract whereby a person transfers ownership of a thing to another for a price in money.  La.Civ.Code art. 2439. The thing, the price, and the consent of the parties are the requirements for the perfection of a sale. *Id*. Ownership is transferred between the parties as soon as there is agreement on the thing and the price is fixed, even though the thing sold is not yet delivered nor the price paid. La.Civ.Code art. 2456.   According to the comments, only ownership, not risk, is governed by this article.

SSOT  directs the Court to that provision of the Civil Code which provides "An agreement whereby one party promises to sell and the other promises to buy a thing at a later time, *or upon the happening of a condition*, or upon performance of some obligation by either party, is a bilateral promise of sale or contract to sell . . . . A contract to sell must set forth the thing and the price, and meet the formal requirements of the sale it contemplates." La.Civ.Code  art. 2623.  (Emphasis

added) According to the comments, in this type of agreement, both ownership and risk remain with the vendor.

Since a sale is, by definition, a contract, the interpretation of that contract is the determination of the common intent of the parties. La. Civ.Code art. 2045.  A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties.  La.Civ.Code art. 2053.

There is no dispute that the 'thing' agreed upon was 100,000 feet of N-80 pipe, particularly described in the Final Invoice from Technical. There is likewise no dispute as to the price of the pipe also referenced in the documents. Since there was an agreement to the thing and the price, the elements necessary for the intended contract of sale appear to be present. Assuming that to be the case, ownership would have transferred to SSOT on June 24, 2008.[41]  The fact that the Final Invoice called for a payment for more than 50% of the purchase price would similarly suggest that a sale, rather than a contract to sell contemplated by Article 2623, had actually occurred.

However, both parties agree that the transaction between them was

---

[41]Because this transaction involved a movable, even though the invoice had not been completed, the sale may nonetheless have occurred based on the conduct of the parties. La.Civ.Code art. 2602.

-15-

conditioned upon the pipe passing inspection criteria set by a third  party.[42]

Therefore, the threshold issue is whether the language in the Final Invoice that "All

pipe that does not meet Shell Oil Company inspection criteria will be returned to

Technical Industries, Inc." creates a sale subject to a condition, and if so, what type

of condition.  The outcome will be determinative of ownership, and consequently,

the rights and remedies of the parties.

*B. The language of the contract is ambiguous*

"Whether an ambiguity exists in contractual language is a question of law for

the court." *Avatar Exploration, Inc. v. Chevron, U.S.A., Inc.*,33 F.2d 314, 320 (5th

Cir.1991) (applying Louisiana law) (citation omitted). "A contract is ambiguous

only if its terms are unclear or susceptible to more than one [reasonable]

interpretation, or the intent of the parties cannot be ascertained from the language

employed." *Gebreyesus v. F.C. Schaffer & Assoc., Inc.*, 204 F.3d 639, 643 (5th

Cir.2000) (applying Louisiana law); *see also TIG Insurance Co. v. Eagle Inc.*, 294

Fed.Appx. 920, 923-24 (5th Cir.2008) (applying Louisiana law and employing the

'reasonable' language included above).

---

[42]This Court does find that exactly what the parties intended the inspection criteria
might be, what was to be marked, what was to be rejected and for what reason are all
facts in dispute based on the documents presented and likely would deny the motion on
that basis if the threshold issue was determinable as a matter of law.

The Court finds that the language, standing alone and in conjunction with the other information on the Final Invoice, does not answer the question of the type of condition involved as it is susceptible to more than one reasonable interpretation and the intent of the parties cannot be ascertained from the language.

*C. The dispute of fact as to the intent of the parties*

Under Louisiana law, performance of a contractual obligation may be subject to a suspensive condition such that it is not enforceable unless and until that uncertain event occurs.  La.Civ.Code art. 1767.  However, if the obligation may be immediately enforced but will come to an end when the uncertain event occurs, the condition is resolutory. *Id.*. Conditions may be either expressed in a stipulation or implied by the law, the nature of the contract, or other intent of the parties.  La. Civ.Code art. 1768.

SSOT contends that it reserved the "view or trial" of the pipe pursuant to La.Civ.Code art. 2460 based on the conditional language in the purchase order/invoice.  Under this article, when the buyer has reserved the view or trial of the thing, ownership is not transferred from the seller to the buyer until the latter gives his approval of the thing.  Therefore, a buyer's reservation of the view or trial of the thing under Article 2460 would be a suspensive condition.  *Levin v. May,* 887 So.2d 497, 505 (La. App. 1ˢᵗ Cir. 2004) citing *Chartres Corp. v. Honeycutt,*

342 So.2d 1251, 1253 (La. App. 4th Cir. 1977) *writ denied,* 345 So.2d 59 (La. 1977). SSOT contends that, since Shell's approval was never given, which this Court also finds is a fact in dispute, ownership was never transferred.[43]

Technical contends the condition is resolutory, and whatever pipe did not pass the inspection criteria, (a fact this Court also finds in dispute) the obligation to purchase  would terminate as to that pipe. Technical would be obligated to return the funds for that pipe and SSOT would not be under any obligation to purchase it. This is so because the result of the failure of a resolutory condition is that the parties are returned to the same state as though the obligation did not exist. *Intercontinental Engineering-Manufacturing Corp. v. C.F. Bean Corp.* 647 F.2d. 621, 627 (5th Cir. 1981).  In this instance, there would be a perfected sale, and therefore, transfer of ownership, with a resolutory condition to allow the buyer to withdraw from the perfected sale as to the pipe that did not pass inspection. *Id.*

Conversely, if the condition is suspensive, then the obligation to pay for any or all of the pipe should not have come into being until the condition was satisfied

_____

[43]La.Civ.Code Arts. 2604-2606 provide that a buyer may only reject nonconforming things within a reasonable time and if the buyer, with knowledge, accepts nonconforming things, it may no longer reject those things on the basis of that nonconformity unless the acceptance was made in the reasonable belief that the nonconformity would be cured. The facts are in dispute whether SSOT, Chickasaw or Shell accepted any nonconforming things, and the effect of that acceptance, if it occurred under principles of agency.

as the very nature of a suspensive condition is such that there is no obligation on the party who relies on the condition to perform its obligation until the condition is fully satisfied. *Mumblow v. Monroe Broadcasting, Inc.* 401 F.3d 616, 622-623 (5th Cir. 2005)  In short, SSOT would not have had to pay for any of the pipe until the pipe passed inspection.  Either that did not happen, which reflects an intent that the condition may have indeed been resolutory, or some of the pipe did pass inspection which this Court cannot determine from this record.

SSOT clearly paid for some of the pipe even before the initial testing process was complete.  The TG tests showed, even though the pipe had some defects, they were not designated as "Shell's" defects, and SSOT represented that Shell would take that pipe after it was repaired. Shell's representative testified to the contrary long after the transaction had fallen apart.

Technical continued to assert that it would take back only the pipe that did not pass inspection, and finally, any pipe that Shell "did not need."  However, in his last correspondence, Mr. Sfeir appears to have changed, or at least restated, what his intent was, i.e. SSOT was to inspect 10,000 feet, then decide to buy all of the pipe or not. While that statement reflects an intent that the condition was suspensive, it does not appear to comport with the positions taken previously.

Finally, it appears *Chickasaw*, whose role as agent is very unclear from the

record, suggested all of the pipe should be returned, not because it did not pass Shell's criteria, but because they were having trouble tracing the pipe. Whether Technical ever demanded the return of all of the pipe as suggested by SSOT is also disputed question of fact which must be resolved at a trial on the merits.

### Conclusion

SSOT, as the movant and party who is seeking to rely on the suspensive condition bears the burden of proof on this issue. *Mumblow v. Monroe Broadcasting, Inc.*, 401 F.3d at 623.  The express language of the Final Invoice does not "compel" that construction and this Court cannot infer that condition "unless there is clear evidence that the parties agreed on such a condition." *Id.* at 622-623.  The Court finds there are genuine issues of material fact as to whether the parties intended that this was a sale subject to a suspensive condition, in which event ownership and risk remained with Technical, or a perfected sale under a resolutory condition such that ownership was transferred.  The resolution of that issue is threshold to the issue of ownership and the rights of the parties.  The Court further finds that there is an issue of fact whether Technical ever called for return of ALL of the pipe.  Until these issues are resolved,  the Court need not reach the myriad of other disputed issues, i.e. the inspection criteria, what pipe passed and what did not, the issues of agency, the time delays and the good faith of the buyer.

-20-

For the foregoing reasons, the motion will be denied.

Signed this 27th day of September, 2011 at Lafayette, La.

Patrick J. Hanna
United States Magistrate Judge
800 Lafayette St., Suite 3500
Lafayette, Louisiana 70501
(337) 593-5140 (phone) 593-5155 (fax)

-21-